UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

June 2019 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

            v.

JAMES NATE BELL,
REGINA PIEHL,
MICHAEL EDWARDS, and
SARA SAMHAT,

        Defendants.

No. SA CR 2:20CR00018-JVS

I N D I C T M E N T

[18 U.S.C. § 1347(a)(2): Health
Care Fraud; 42 U.S.C. § 1320a-
7b(b): Illegal Remunerations in
Connection with Federal Health
Care Programs; 18 U.S.C. § 1341:
Mail Fraud; 18 U.S.C. § 1957:
Engaging in Monetary Transactions
in Criminally Derived Property
Over $10,000; 18 U.S.C. §§ 981 and
982 and 28 U.S.C. § 2461(c):
Criminal Forfeiture]

///

///

///

///

///

///

PGS:pgs

The Grand Jury charges:

COUNTS ONE THROUGH TWENTY-ONE

[18 U.S.C. §§ 1347(a)(2), 2]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

Defendants and Related Entities

1.   Defendant JAMES NATE BELL was a resident of Anaheim, California.  Defendant BELL was the beneficial owner and manager of a pharmacy known as Professional Compounding Pharmacy LLC ("Professional Compounding"), located at 721 W. Whittier Boulevard, Suite H, La Habra, California, with a second location at 570 Central Avenue, Brea, California.  Professional Compounding specialized in the preparation of compound medications, especially compound creams, based upon prescriptions authorized by physicians, nurse practitioners, and physician's assistants, which typically yielded extremely high rates of reimbursement from government and private insurance companies.

2.   Defendant BELL was also the beneficial owner and manager of two successive and functionally equivalent purported medical marketing companies, Algia Pharmaceuticals MR&D, located at 1440 East Stearns Avenue, La Habra, California, and Algia, Inc., located at 560 Peralta Hill Drive, Anaheim Hills, California ("Algia").  Algia did not actually provide any medical marketing or advertising services for Professional Compounding or for any other pharmacy.  Rather, it served as a financial conduit that enabled Professional Compounding indirectly to pay commissions and/or kickbacks to sales agents and medical marketers who solicited prescriptions for compound creams

1  from physicians, nurse practitioners, and physician's assistants, and
2  then routed these scripts, once obtained, to Professional Compounding
3  for fulfillment.

4      3.    Product For Doctors, Inc. ("PFD") was a medical marketing
5  company, which was located at 27001 La Paz Road, Suite 348, Mission
6  Viejo, California, and did business with Algia and Professional
7  Compounding.  Among its other business activities, PFD engaged sales
8  or marketing agents who recruited physicians, nurse practitioners,
9  and physician's assistants to write prescriptions for compound creams
10 for patient beneficiaries, which prescriptions were then routed back
11 to PFD and to Professional Compounding to be filled at lucrative
12 rates of reimbursement.  Through the management and operation of PFD,
13 the principals of PFD received and paid commissions for the referral
14 of prescriptions for compound creams, and other compounded
15 medications, to Professional Compounding.

16     4.    Defendant REGINA PIEHL was a resident of Los Angeles,
17 California.  Defendant PIEHL served as a sales agent/marketer for PFD
18 and in that capacity engaged physicians, nurse practitioners, and
19 physician's assistants to write prescriptions for compound creams
20 that were routed by defendant PIEHL to PFD and ultimately to
21 Professional Compounding for fulfillment.  Defendant PIEHL also
22 served as the owner and operator of a medical care spa known as
23 Coastal Therapy Group, Inc. ("CTG"), which was located at 16818
24 Hawthorne Boulevard, in Lawndale, California in a building owned by
25 defendant PIEHL.

26     5.    In her capacity as a sales agent/marketer of prescriptions
27 for compound creams and related compound medications for Professional
28 Compounding, defendant PIEHL operated three different business

3

entities through which she received and paid commissions for the referral of prescriptions to Professional Compounding, namely: (1) Worldwide Marketing Group ("WMG"), located at 350 Bellino Drive, Pacific Palisades, California; (2) Global Management Network, Inc. ("GMN"), located at 16818 Hawthorne Boulevard, Lawndale, California; and (3) Century Therapy Group, Inc., located at 350 Bellino Drive, Pacific Palisades, California.

6.   Defendant MICHAEL EDWARDS was a medical doctor and a resident of Huntington Beach, California.  With the assistance of defendant PIEHL, defendant EDWARDS set up and supervised sham clinical pain studies at two different clinics he established that treated patients only once or twice a week, usually on the weekends. One of these weekend clinics was located at CTG (which was owned by defendant PIEHL) ("the CTG clinic"), and the second weekend clinic was located at 3142 East Plaza Boulevard, Unit T, National City, California ("the National City clinic").  Defendant EDWARDS's clinical studies purported to analyze the effectiveness of compound creams, and related compound medications, as an alternative to commonly-prescribed oral medications, such as opioids, for the treatment of pain.  In fact, defendant EDWARDS's pain studies exclusively targeted a particular class of patients who had government or private insurance that paid lucrative reimbursement rates for compounded creams and related medications, and their purpose was simply to generate a high and recurring volume of prescriptions for compounded creams for those patients participating in the studies.

7.   Defendant EDWARDS received substantial commission payments from defendant PIEHL for having referred compound drug prescriptions

4

to Professional Compounding through defendant PIEHL and PFD. Defendant PIEHL disguised these commission payments to defendant EDWARDS as supposed charitable contributions to defendant EDWARDS's alleged non-profit research organization, the Foundation for the Permanent Elimination of Nerve Pain and Disability ("the Foundation"), located at 21039 South Figueroa Street, Suite 201, Carson, California, or as payments to one of defendant EDWARDS's business entities, namely, the Mobil Medical Records Association ("MMRA"), at the same address.

8. Defendant SARA SAMHAT served as a marketer who assisted defendant EDWARDS in the routing of prescriptions for compounded creams and related medications to defendant PIEHL, to PFD, and to Professional Compounding. Defendant SAMHAT received commission payments from defendant PIEHL for the routing of these prescriptions for compounded medications to PFD and to Professional Compounding. These commission payments were directed in many instances by defendant PIEHL to defendant SAMHAT's marketing company, known as Mobil Medical Records Technology, Inc. ("MMRT"), also located at 21039 South Figueroa Street, Suite 201, Carson, California.

9. "Physician 1" was a licensed California physician, who was hired and paid by defendant EDWARDS to work at the National City clinic. Defendant EDWARDS encouraged Physician 1, directly and indirectly, to prescribe compound creams or related compound medications to treat patients recruited by defendant EDWARDS and his staff to attend the clinic as part of defendant EDWARDS's purported pain study.

10. Nurse Practitioner 1 ("NP 1") was a licensed California nurse practitioner, who was hired by defendant PIEHL to work with

defendant EDWARDS at the CTG clinic.  Defendant PIEHL subsequently referred NP 1 to assist defendant EDWARDS in treating patients who attended defendant EDWARDS's National City clinic.  NP 1 was encouraged, directly and indirectly, by defendants PIEHL, EDWARDS and SAMHAT to prescribe compound creams or related compound medications to patients who were recruited by defendant EDWARDS and his staff, or by defendant PIEHL, to seek treatment at the two clinics through which defendant EDWARDS conducted his sham pain studies.

Compounded Medications

11.  In general, "compounding" was a practice by which a licensed pharmacist combined, mixed, or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.  Compounded drugs were not approved by the U.S. Food and Drug Administration ("FDA"), that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.  The California Board of Pharmacy regulated the practice of compounding in the State of California.

12.  Compounded drugs, including topical compounded creams, may be prescribed by a physician when an FDA-approved drug or ointment did not meet the health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved drug, such as a dye or a preservative, a compounded drug or topical cream could be prepared that excluded the substance that triggered the allergic reaction.  Compounded drugs were available when a patient could not consume a drug by traditional means, such as an elderly patient or a child who could not swallow an FDA-approved pill and needed the drug in a liquid or cream/ointment form that was not otherwise available.

TRICARE

13.    TRICARE was a health care benefit program, as defined by 18 U.S.C. § 24(b), and a federal health care program, as defined by 42 U.S.C. § 1302a-7b(f)(1), that provided health care benefits, items, and services to Department of Defense beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

14.    Express Scripts, Inc. ("ESI") was a prescription benefit plan manager that administered TRICARE's prescription drug benefits, acting at all relevant times as an agent of TRICARE.  Claims for reimbursement for services rendered or goods provided, including covered compounded drug prescriptions, were submitted to ESI for payment by TRICARE.

15.    TRICARE provided health care benefits for certain prescription drugs, including certain topical compounded creams and ointments, that were medically necessary and prescribed pursuant to TRICARE rules and regulations.  In order to become a pharmacy entitled to submit claims for reimbursement to the TRICARE program, a pharmacy was required to execute a "PSAO Pharmacy Affiliation Authorization" under which the pharmacy agreed to comply with all applicable state and federal laws including, among other things, that no claims for reimbursement would be submitted to TRICARE for filling a prescription absent proof that the prescription followed a face-to-face examination by a physician, reflecting a bona fide doctor-patient relationship, and that the fulfilling pharmacy would collect a co-payment from the beneficiary at the time of dispensing a prescription.

16.    During the calendar years of 2013-2015, inclusive, the
period of time during which defendant BELL, and others known and
unknown to the Grand Jury, operated Professional Compounding,
Professional Compounding had the following TRICARE claims activity,
substantially all of which was for filling prescriptions for
compounded creams and related compound medications:

| CALENDAR YEAR | NUMBER OF CLAIMS | AMOUNT CLAIMED | AMOUNT PAID | AVG PMT/CLAIM |
|---|---|---|---|---|
| 2013 | 62 | $60,344 | $58,004 | $936 |
| 2014 | 1342 | $5,120,445 | $4,407,585 | $3,284 |
| 2015 | 2745 | $17,477,141 | $14,707,029 | $5,358 |

17.    In early 2015, TRICARE announced that, as of the beginning
of May 2015, it would no longer be reimbursing pharmacies for filling
prescriptions for compound creams at the lucrative reimbursement
rates it had been previously providing.  As a result of this
impending change in TRICARE's reimbursement policy for compound
drugs, Professional Compounding accelerated its solicitation of
compound drug prescriptions in March and April 2015 from its
established marketers, resulting in the presentation of over 2100
claims for compound drug prescriptions to TRICARE, in the billed-for
amount of over $14 million, in these two months directly preceding
the TRICARE cut-off date of May 2015.

ILWU HEALTH CARE BENEFIT PLAN

18.    The International Longshore and Warehouse Union ("ILWU") –
Pacific Maritime Association Welfare Plan ("the ILWU Plan") was a
health care benefit program, as defined by 18 U.S.C. § 24(b), for
active and retired dockworkers, ship clerks, foremen and watchmen, as
well as their qualified dependents and survivors.  The ILWU Plan
provided health care benefits for hospital, medical, surgical care
and prescription drugs.  The ILWU Plan was a self-funded indemnity

plan which received contributions from employers, registered
employees, and the ILWU to fund the plan, the proceeds of which were
then used to pay health insurance benefits for plan beneficiaries.
Union members were generally guaranteed the maximum benefit,
typically 100% of the charge for covered services.

19.   All persons who enjoyed ILWU Plan eligibility and
qualified for hospital, medical and surgical benefits also typically
enjoyed eligibility for benefits under the ILWU Prescription Drug
Program.

20.   The ILWU Plan used OptumRX, a third-party plan
administrator, to process and pay prescription drug claims submitted
by health care providers to fill prescriptions written for ILWU Plan
beneficiaries.  The ILWU Plan ultimately funded the payment of claims
submitted by providers to OptumRX that OptumRX determined were
covered by the ILWU Plan, and at all relevant times OptumRX was
acting as an agent of the ILWU Plan.  To bill OptumRX for
prescription drugs covered under the ILWU Plan for ILWU Plan
beneficiaries, a health care provider, e.g., a pharmacy, would submit
a claim to OptumRX electronically on a standard claim form (Form
1500), identifying, among other things, the patient's name and
identification number, diagnosis, the type of drug dispensed to the
ILWU Plan member, the date of service, the charge for the service,
the prescribing physician, and the provider.  OptumRX reimbursed
pharmacy providers only for medically necessary prescription drugs.
OptumRX sent reimbursement checks to pharmacy providers through the
United States mail, and the ILWU Plan routinely paid OptumRX the full
amount of these reimbursement checks sent to pharmacy providers, as

1  well as paying OptumRX administrative fees for processing the

2  pharmacy provider claims.

3       21.   In order to become a pharmacy entitled to submit claims

4  for reimbursement to OptumRX, a pharmacy was required to execute an

5  agreement with OptumRX, whereby it would become an OptumRX

6  Credentialed Pharmacy.  Pursuant to this agreement, the pharmacy

7  agreed to comply with all applicable state and federal laws relating

8  to fraud and abuse.  Based upon guidance provided by OptumRX in its

9  handbook, this included the requirement of avoiding, among other

10 things, illegal remuneration schemes, script mills, and altered and

11 forged prescriptions.

12      22.   Between early 2014 until the beginning of May 2015, it

13 was well-known within the compounded drug industry, among pharmacists

14 and marketers alike, that TRICARE paid some of the highest rates of

15 reimbursement for the fulfillment of prescriptions for compound

16 creams, ointments, and related medications.  It was also well-known

17 within the compounded drug industry that the ILWU Plan offered higher

18 rates of reimbursement for compound creams than other comparable

19 private health care providers, although generally not quite as

20 generous as TRICARE, and the ILWU Plan continued doing so through the

21 middle of 2016.

22 B.   THE FRAUDULENT SCHEME

23      23.   Beginning on or about a date unknown, but at least as

24 early as on or about April 2014, and continuing to on or about August

25 2016, in Los Angeles and Orange Counties, within the Central District

26 of California, and elsewhere, defendants BELL, PIEHL, EDWARDS, and

27 SAMHAT, together with others known and unknown to the Grand Jury,

28 knowingly, willfully, and with the intent to defraud, executed and

                                   10

attempted to execute a scheme and artifice to obtain money from health care benefit programs, namely, TRICARE and the ILWU Plan, as well as other private health care benefit programs as defined under 18 U.S.C. § 24(b), by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.   MANNER AND MEANS OF THE FRAUDULENT SCHEME

24.   The fraudulent scheme operated, in substance, in the following manner:

Setting Up a Compound-Cream Prescription Mill at the CTG Clinic

a.   Defendants EDWARDS and PIEHL, and others known and unknown to the Grand Jury, agreed to take, and took, the following steps, among others, to establish a compound prescription mill in which ILWU-Plan beneficiaries, along with other privately insured beneficiaries, were recruited, along with NP 1, to generate and fill multiple prescriptions for medically unnecessary compound creams that were subsequently submitted to Professional Compounding for lucrative reimbursement and to fund payments to downstream marketers:

i.   In or about early 2014, defendant PIEHL offered NP 1 a part-time job as a nurse practitioner at a clinic at CTG. Defendant PIEHL represented to NP 1 that she was a business partner of defendant EDWARDS, and that NP 1 would be compensated between $500 and $1500 a day, as a flat rate, to do follow up visits from time to time for defendant EDWARDS's patients at CTG.   Defendant PIEHL also falsely assured NP 1 in this context that she was a licensed registered nurse and was therefore qualified to serve as a business partner of a doctor.

1          ii.     Shortly after NP 1 accepted the job, NP 1 was
2   contacted by defendant PIEHL and was asked to travel to the CTG
3   clinic to perform follow-up visits on defendant EDWARDS's patients
4   approximately one Saturday per month.  In that role, NP 1 was
5   encouraged, particularly by defendant PIEHL, to prescribe compound
6   cream medications to address the pain issues reported by defendant
7   EDWARDS's patients, which NP 1 did.

8          iii.    Defendant PIEHL would often bring the patients
9   into the treatment room used by NP 1 with pre-printed prescription
10  forms containing specific menu options for the prescribing of
11  compound creams, so that NP 1 merely had to check individual boxes on
12  the forms to ensure the recommended compound creams were prescribed.

13         iv.     The CTG clinic solicited patient beneficiaries
14  from the ILWU Plan by offering payments of $200 per patient if the
15  patients sought treatment for their pain symptoms by requesting
16  compound cream medications, based in part on the pretense that the
17  patients were participating in an authorized study conducted by
18  defendant EDWARDS of the effectiveness of these compound cream
19  medications, for which the patients were entitled to be compensated.

20         v.      In fact, the alleged pain study was a sham and
21  the $200 payments served solely as a ruse to attract ILWU Plan
22  beneficiaries and induce them to accept compound cream prescriptions,
23  which were subsequently sent to Professional Compounding through PFD
24  for processing by OptumRX at high rates of reimbursement.
25  Professional Compounding subsequently paid a significant portion of
26  the reimbursement proceeds it received from OptumRX to downstream
27  marketers, such as PFD, which in turn forwarded these proceeds to
28  defendants PIEHL and SAMHAT.

vi.   Defendant EDWARDS also separately treated a number of patients at the CTG clinic, all of whom were also paid $200 per visit.  Defendant EDWARDS wrote a number of compound cream prescriptions for these patients that were subsequently submitted to Professional Compounding for fulfillment, as a result of which defendant EDWARDS received substantial referral fees through defendant PIEHL.

vii.   After the ILWU Plan beneficiaries completed their initial visits at the CTG clinic with either defendant EDWARDS or NP 1, they were provided with a check for $200 by defendant PIEHL, or by others acting under defendant PIEHL's direction, which was drawn on the bank account of defendant EDWARDS's Foundation, the alleged non-profit research foundation controlled by defendant EDWARDS.

<u>Setting Up a Second Compound-Cream Prescription Mill</u>

b.   Defendants EDWARDS, PIEHL and SAMHAT, and others known and unknown to the Grand Jury, agreed to take, and took, the following steps, among others, to establish a second compound-cream prescription mill in which TRICARE beneficiaries were recruited, along with NP 1 and Physician 1, to generate and fill multiple prescriptions for medically unnecessary compound creams that were subsequently submitted to Professional Compounding for lucrative reimbursement by TRICARE:

i.   In or about August 2014, as interest in soliciting new ILWU Plan beneficiaries to receive compound prescriptions waned, defendant EDWARDS, in consultation with defendant PIEHL, decided to initiate a second sham pain study targeting TRICARE beneficiaries located in the San Diego area, which

13

1    had a large population of elderly U.S. veterans, particularly

2    Filipino veterans.

3              ii.    To implement this purpose, defendant EDWARDS,

4    assisted by defendants PIEHL and SAMHAT, secured office space from an

5    existing chiropractic practice and set up the National City clinic in

6    around August or September 2014.  The National City clinic offered

7    treatment for pain to TRICARE beneficiaries exclusively on the

8    weekends, typically on Friday or Saturday, when defendants EDWARDS

9    and SAMHAT would travel down from Los Angeles to oversee the

10   operation of the clinic.

11             iii.   The National City clinic solicited patient

12   beneficiaries from TRICARE by offering payments of $200 per patient

13   if the patients sought treatment for their pain symptoms at the

14   clinic and filled out paperwork for the purported study, based in

15   part on the pretense that the patients were participating in a study

16   conducted by defendant EDWARDS's alleged non-profit Foundation

17   concerning the effectiveness of pain therapies that provided an

18   alternative to standard oral medications (such as opioids), focusing

19   in particular on compound creams.

20             iv.    In fact, the Foundation's alleged pain study was

21   a sham, and while defendant EDWARDS hired and paid office staff

22   through his Foundation to obtain paperwork relating to the patients'

23   pain history, defendant EDWARDS never consistently collected or

24   retained data concerning the effectiveness of the treatments or

25   medications they received through the National City clinic.  In

26   effect, the $200 payments served solely as a ruse to attract TRICARE

27   plan beneficiaries and to induce many of them to accept compound

28   cream prescriptions, which were subsequently submitted to

                                   14

Professional Compounding for fulfillment at extremely high rates of reimbursement.

v.    The most important written information obtained by defendant EDWARDS's office staff from their intake with the TRICARE patients participating in the purported study was their gathering of insurance information and military identification, as reflected by the fact that office staff was instructed as the first item of their "Photo Copy Checklist" to ensure that a copy of each patient's TRICARE card and military ID was maintained in the file for subsequent billing.

vi.    Aside from hiring marketers and staff at the National City clinic through the Foundation to solicit TRICARE plan beneficiaries and obtain necessary identifying TRICARE insurance information, defendant EDWARDS, with the assistance of defendant PIEHL, hired NP 1 and Physician 1, as well as other physicians and physician's assistants, to work at the clinic on weekends, and defendants EDWARDS and PIEHL jointly paid compensation to NP 1 and Physician 1 for their work at the clinic on a per diem basis through various corporations that they separately controlled.

vii. In connection with NP 1's work at the National City clinic, NP 1 was encouraged by defendant EDWARDS, as well as by others working at the clinic, directly and indirectly to prescribe a nearly identical set of compound-cream medications to virtually all of the patients NP 1 treated from a pre-printed form that was provided to NP 1 by the clinic.  Shortly after NP 1 completed treating patients, NP 1 occasionally overheard defendant EDWARDS informing patients that they would be getting paid.

15

viii.    When defendant EDWARDS engaged Physician 1 to work at the National City clinic, defendant EDWARDS informed Physician 1 that, in collaboration with defendant SAMHAT, defendant EDWARDS set up the clinic to study the effectiveness of compound-cream medications for the treatment of pain.  Defendants EDWARDS and SAMHAT provided Physician 1 with a small number of prescription templates from particular pharmacies that contained specific menu options for the prescribing of compound-cream medications, several of which they recommended as having been highly effective in the past.

ix.    Relying in significant part on the recommendations of defendant EDWARDS, who was acting in coordination with defendant SAMHAT, Physician 1 wrote several hundred prescriptions for compound creams for numerous TRICARE beneficiaries between approximately October 2014 and January 2015, the vast majority of which were forwarded to Professional Compounding for fulfillment through PFD.  The prescriptions from Physician 1 resulted in several million dollars in reimbursements from TRICARE to Professional Compounding and in payments by Professional Compounding to downstream marketers such as PFD, which in turn provided commission/kickback payments to defendant PIEHL, among others.

x.    After NP 1 and Physician 1 completed writing compound cream prescriptions for individual patients at the National City clinic, the prescriptions and patient files were transmitted to the custody of defendant SAMHAT, who reviewed the prescriptions and in some instances told Physician 1 to check certain boxes on the prescription forms that Physician 1 had supposedly overlooked or omitted.  The prescriptions were then routed by defendant SAMHAT, and by office staff working under the direction of defendants EDWARDS and

16

1   SAMHAT, to PFD before finally being transmitted to Professional

2   Compounding.  In several instances, defendant SAMHAT and EDWARDS also

3   caused the insurance cards and military identification cards of

4   TRICARE beneficiaries, containing personal identifying information

5   (such as social security numbers), to be faxed electronically to PFD,

6   along with their compound cream prescriptions.

7            xi.  On multiple occasions, the prescriptions that

8   were written by NP 1 and Physician 1 for compound creams were

9   modified after they were turned over to the custody of defendants

10   SAMHAT and EDWARDS, such that the modified prescriptions reflected

11   that between six and eleven refills of the compound cream

12   prescriptions were authorized, when in fact NP 1 and Physician 1 only

13   actually authorized refills of these prescriptions on an as-needed

14   basis.  The vast majority of these fraudulently modified

15   prescriptions for refills were submitted to ESI by Professional

16   Compounding for payment by TRICARE.

17            xii.  When the issue arose as to which party was

18   going to bear responsibility for paying for the compound creams that

19   were prescribed through the pain study conducted at the National City

20   clinic, defendant SAMHAT falsely assured patients that the clinic

21   would be providing patients with a free trial of these creams for at

22   least a month, while defendant EDWARDS told TRICARE beneficiaries not

23   to worry because they would not be required to make any out-of-pocket

24   payments for these creams even if their insurance provider was billed

25   for the creams.  In fact, defendants EDWARDS and SAMHAT both knew

26   that: (1) TRICARE would be paying extremely high rates of

27   reimbursement for these compound cream claims, as much as $3,000-

28   $10,000 per tube of cream; (2) TRICARE had not agreed to waive their

1  beneficiaries' obligation to make a co-payment on these compound

2  cream prescription claims; and (3) TRICARE had neither been informed

3  of, nor agreed to, paying for compound creams prescribed in

4  connection with defendant EDWARDS's purported pain study.

5          xiii.    Defendant EDWARDS also separately treated a

6  number of patients on his own at the National City clinic, all of

7  whom were also paid $200 per visit, and he wrote a number of compound

8  cream prescriptions for these patients that were subsequently

9  submitted for fulfillment, as a result of which defendant EDWARDS

10 received commission payments through the Foundation from defendant

11 PIEHL and her related entities.

12         xiv.   After the TRICARE beneficiaries completed their

13 initial visits at the National City clinic with either defendant

14 EDWARDS, Physician 1 or NP 1, and other physicians and physician's

15 assistants, the beneficiaries were provided with checks for $200 by

16 defendant EDWARDS, or by others acting at defendant EDWARDS's

17 direction, which were drawn on the bank account of the Foundation.

18         PFD Accepts Compound Prescriptions For TRICARE Beneficiaries

19         c.   Beginning in or about September 2014, defendant PIEHL

20 contacted one of the principals of PFD in order to secure PFD's

21 agreement to accept a large volume of compound cream prescriptions

22 for TRICARE beneficiaries that were being generated by the National

23 City clinic, and defendant PIEHL, working in collaboration with the

24 principals of PFD, subsequently took the following steps to ensure

25 that these prescriptions would be provided to PFD and then forwarded

26 to Professional Compounding for submission to TRICARE at lucrative

27 reimbursements rates:

28         i.   In early September 2014, defendant PIEHL reported

18

to the principals of PFD that she had located a great new program in San Diego, California involving clinics that focused on prescribing compound creams for TRICARE beneficiaries, and she wanted to refer these prescriptions to PFD for processing with the compounding pharmacies with which PFD was affiliated, including Professional Compounding.

      ii.   In internal discussions among the principals of PFD, there were concerns that PFD would not be able to accept this business, because TRICARE was a federally funded-health insurance program and receipt and/or payment of commissions or referral fees to marketers for the submission of such prescriptions to pharmacies would potentially violate the federal anti-kickback statute.   In fact, the sales commission agreement between PFD and Algia, the marketing arm of Professional Compounding, expressly provided that there shall be "[n]o Commission for Government-Paid Prescriptions." However, defendant BELL falsely assured the principals of PFD that payment of commissions to PFD by Algia would not run afoul of the federal anti-kickback statute because Algia was an independent marketing company, separate from Professional Compounding, such that PFD was not effectively receiving commission payments from a pharmacy.

      iii.   Notwithstanding these issues, and based in part upon the assurances of defendant BELL, the principals of PFD accepted the referral of a large number of compound prescriptions for TRICARE beneficiaries from the National City clinic between October 2014 and May 2015, which were subsequently submitted to Professional Compounding for fulfillment and reimbursement by TRICARE.

      iv.   As a result of PFD's decision, PFD received over

19

$9 million in commission payments for the referral of compound prescriptions for TRICARE beneficiaries from Professional Compounding between October 2014 and May 2015, and defendant PIEHL received over $2.5 million in commission payments from PFD, a significant portion of which she transferred to defendants EDWARDS and SAMHAT through various entities that they jointly controlled.

v.   After TRICARE significantly reduced its reimbursement rates for compound creams starting in the beginning of May 2015, PFD discontinued its submission to Professional Compounding of compound prescriptions for TRICARE beneficiaries.  However, PFD continued to accept and submit compound prescriptions to Professional Compounding for ILWU Plan beneficiaries that originated from the CTG clinic through approximately April 2016, because OptumRX continued to pay reimbursements on behalf of ILWU Plan beneficiaries for compound cream prescriptions at relatively high levels through April 2016.

<u>Fraudulent Claims Submitted to TRICARE and the ILWU Plan</u>

d.   Defendant BELL, and others known and unknown to the Grand Jury, used, and directed employees of Professional Compounding to accept compounded drug prescription forms that were distributed to marketers and doctors for the purpose of filling compounded drug prescriptions.  The forms identified multiple compounded drug formulations, purportedly to treat pain, stretch marks, migraines, and wounds, and to promote general wellness, that were included on the forms because they provided the maximum possible TRICARE and/or ILWU Plan reimbursements rather than because they addressed legitimate, individual patient needs and were medically necessary.

e.   Defendant BELL, aided and abetted by defendants PIEHL, EDWARDS, and SAMHAT, and others known and unknown to the Grand

Jury, filled and caused to be filled compounded drug prescriptions and caused false and fraudulent claims for reimbursement to be submitted to TRICARE and to the ILWU Plan, and to other private health care programs, claims that were demonstrably spurious because, among other things:

       i.     Substantially all of the prescriptions were faxed or electronically sent to Professional Compounding and PFD from marketers to whom Professional Compounding and PFD had agreed to pay commissions/kickbacks disguised as advertising or marketing fees, while these prescriptions were solicited from doctors and patients who were paid by marketers principally in order to enable these marketers to realize kickbacks or referral fees on each claim that was reimbursed by TRICARE, the ILWU Plan, or other private health care benefit programs.

       ii.    Substantially all of the prescriptions were identically or nearly identically described on the same or similar prescription form or pad that identified pre-formulated compounds, and these forms typically originated with Professional Compounding or with other pharmacies that were paying commission fees and soliciting prescriptions that were refined by the marketers to maximize reimbursement rates.

       iii.   Few, if any, of the beneficiaries for whom the prescriptions were provided ever paid, nor did Professional Compounding attempt or ever intend to collect, any co-payment as required by TRICARE.

       iv.    The relatively small number of purported prescribing physicians recurred on multiple prescriptions and on multiple refills of prescriptions, even though in several instances

these physicians did not in fact actually prescribe multiple refills but indicated only that refills were authorized on an as-needed basis.

v.     Professional Compounding conducted little, if any, due diligence upon receipt of the prescriptions to verify whether, in fact, the beneficiaries actually sought the prescribed medications.  Indeed, in several instances Professional Compounding either deliberately refrained from calling beneficiaries to avoid giving notice to beneficiaries or, in other instances, ignored beneficiaries' complaints that the prescriptions were either ineffective or not needed at all, especially after the initial round of prescriptions had been sent out.

vi.     The compounded formulations were virtually identical for all of the beneficiaries regardless of their purported illnesses, and none of the prescriptions was specifically formulated based on the individualized needs, medical history, allergic reaction potential, contraindications, or conflicts with other prescription medications that were unique to each particular beneficiary.

vii.     In submitting reimbursement claims for the compound cream prescriptions filled at Professional Compounding, defendant BELL generally billed the health insurance providers based upon his claimed use of a relatively expensive base cream ingredient known as Versepro, when in fact defendant BELL routinely used a significantly less expensive base cream in preparing the compound cream mixtures, which if accurately reported to TRICARE or the ILWU Plan would have warranted a lower reimbursement amount.

Defendant BELL's Attempt to Conceal the TRICARE Kickback Scheme

f.   In or about August 20, 2016, in connection with responding to TRICARE's audit inquiries regarding the business records and activities of Professional Compounding, defendant BELL requested a meeting with the Chief Executive Officer of PFD to discuss concerns he had regarding the fact that Professional Compounding had been improperly paying millions of dollars in kickbacks to PFD based on adjudicated claims paid by TRICARE to Professional Compounding.

g.   In this meeting, defendant BELL conceded that he was not supposed to be paying referral or commission fees to PFD on TRICARE claims (as expressly prohibited in the existing contract between PFD and Algia), but he proposed that PFD execute a new, backdated contract with Algia, pursuant to which all monies that Algia historically paid to PFD would be accounted for as commission payments for referrals of compound scripts reimbursed by private or PPO insurance plans, not by TRICARE.

h.   Based on this new proposed fictitious contract between Algia and PFD, Algia would make commission payments to PFD, and other marketers, "equivalent to 97.5% of adjudicated amounts paid by non-government sponsored private insurance for compounded prescription drugs," as opposed to the 43% commission payment provided for in the actual existing contract between Algia and PFD.  By falsely revising the contract in this way, and seeking to backdate it, defendant BELL indicated that he could explain to those reviewing his business accounts that the monies he paid to PFD related to referral fees owed based on reimbursement of private insurance claims, rather than based on referral fees for reimbursement of TRICARE claims.

i.    In providing a copy of this fictitious contract to two of the principals of PFD, defendant BELL assured the PFD participants that if they agreed to execute this new proposed fictitious contract, defendant BELL would be able to survive government scrutiny of his business practices at Professional Compounding and Algia and the PFD principals would never have to hear about this again.

j.    As a result of the fraudulent scheme described above, TRICARE suffered financial losses of approximately $19.2 million and the ILWU Plan suffered losses of approximately $2.8 million.

D.    EXECUTIONS OF THE FRAUDULENT SCHEME

25.    On or about the dates set forth below, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendants BELL, PIEHL, EDWARDS, and SAMHAT, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and willfully executed and attempted to execute the fraudulent scheme described above, by submitting and causing to be submitted to TRICARE and the ILWU Plan the following false and fraudulent claims:

| COUNT | DATE | CLAIM | DEFENDANTS |
|-------|------|-------|------------|
| ONE | 2/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary F.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWO | 2/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |

| COUNT | DATE | CLAIM | DEFENDANTS |
|-------|------|-------|------------|
| THREE | 3/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary F.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| FOUR | 3/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| FIVE | 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| SIX | 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| SEVEN | 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary C.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| EIGHT | 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |

| COUNT | DATE | CLAIM | DEFENDANTS |
|---|---|---|---|
| NINE | 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TEN | 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary D.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| ELEVEN | 7/9/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary P.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| TWELVE | 7/9/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary B.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| THIRTEEN | 7/21/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary P.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| FOURTEEN | 12/7/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $11,958 for compounded drug prescription in the name of beneficiary S.S | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

| COUNT | DATE | CLAIM | DEFENDANTS |
|---|---|---|---|
| FIFTEEN | 1/4/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $11,958 for compounded drug prescription in the name of beneficiary B.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| SIXTEEN | 1/29/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary B.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| SEVENTEEN | 2/2/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary A.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| EIGHTEEN | 2/2/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary V.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| NINETEEN | 2/16/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary A.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| TWENTY | 2/16/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary V.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

| COUNT | DATE | CLAIM | DEFENDANTS |
|---|---|---|---|
| TWENTY-ONE | 4/8/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,080 for compounded drug prescription in the name of beneficiary A.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

COUNTS TWENTY-TWO THROUGH TWENTY-SEVEN

[18 U.S.C. §§ 1341, 2(b)]

[ALL DEFENDANTS]

26.   The Grand Jury realleges and incorporates paragraphs 1 through 22 of this Indictment here.

A.   THE MAIL FRAUD SCHEME

27.   Beginning on or about a date unknown to the Grand Jury, but at least as early as in or about April 2014, and continuing through at least on or about August 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants BELL, PIEHL, EDWARDS, and SAMHAT, together with others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised, participated in, executed and attempted to execute a scheme and artifice to obtain money and property from TRICARE and the ILWU Plan, and from other health care benefit programs, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.   MANNER AND MEANS OF THE MAIL FRAUD SCHEME

28.   The mail fraud scheme operated, in substance, by the means and in the manner alleged in paragraph 24 of this Indictment, which is incorporated here.

C.   USE OF THE MAILS

29.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California and elsewhere, the defendants identified below, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the items below to be placed in an

authorized depository for mail matter to be sent and delivered by the United States Postal Service, according to the directions thereon:

| COUNT | DATE | ITEM MAILED | DEFENDANTS |
|-------|------|-------------|------------|
| TWENTY-TWO | 2/5/15 | TRICARE payment, check no. 8327230, in the approximate amount of $298,641 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWENTY-THREE | 3/5/15 | TRICARE payment, check no. 8333105, in the approximate amount of $418,910 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located in La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWENTY-FOUR | 4/30/15 | TRICARE payment, check no. 8344629, in the approximate amount of $1,361,464 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |

| COUNT | DATE | ITEM MAILED | DEFENDANTS |
|---|---|---|---|
| TWENTY-FIVE | 5/14/15 | TRICARE payment, check no. 8347615, in the approximate amount of $2,999,915 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWENTY-SIX | 10/25/15 | ILWU Plan payment, check no. 564983, in the approximate amount of $74,076 and payable to Professional Compounding Pharmacy was mailed from OptumRX offices located in Schaumberg, IL to Professional Compounding Pharmacy located in Brea, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| TWENTY-SEVEN | 3/17/16 | ILWU Plan payment, check no. 8497885, in the approximate amount of $106,382 and payable to Professional Compounding Pharmacy was mailed from OptumRX offices located in Cypress, CA to Professional Compounding Pharmacy located in Brea, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

COUNTS TWENTY-EIGHT THROUGH THIRTY-SEVEN

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

[DEFENDANTS BELL AND PIEHL]

30.   The Grand Jury realleges and incorporates by reference paragraphs 1 through 22 of this Indictment here.

31.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, the defendants identified below knowingly and willfully offered to pay, paid, and caused to be offered and paid remuneration to marketers, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Professional Compounding for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| TWENTY-EIGHT | 2/12/15 | BELL | Check no. 1017 to entity PFD, with the memo line "Feb 5th-11th, 2015," from JP Morgan Chase account ending in 0852 in the name of Algia, Inc. ("JPMC 0852") and signed by defendant BELL | $140,316 |
| TWENTY-NINE | 2/20/15 | PIEHL | Check no. 1037 to entity MMRT from Open Bank account ending in 1860 in the name of WMG ("OB 1860") and signed by defendant PIEHL | $19,400 |
| THIRTY | 2/20/15 | PIEHL | Check no. 376 to entity MMRA from Union Bank account ending in 0486 in the name of GMN ("UB 0486") and signed by defendant PIEHL | $20,000 |

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| THIRTY-ONE | 3/12/15 | BELL | Wire transfer, reference no. ending in 071E, to entity PFD with memo "Aug 29th -Sep11th," from JPMC 0852 caused by defendant BELL | $406,014 |
| THIRTY-TWO | 3/23/15 | PIEHL | Check no. 392 to entity MMRT from Bank of America account ending in 0486 in the name of GMN ("BofA 0486") signed by defendant PIEHL | $19,070 |
| THIRTY-THREE | 3/26/15 | PIEHL | Check no. 677 to entity the Foundation from Union Bank account ending in 4558 signed by defendant PIEHL | $4000 |
| THIRTY-FOUR | 3/27/15 | BELL | Wire transfer, reference no. ending in 086E, to entity PFD from JPMC 0852 caused by defendant BELL | $687,616 |
| THIRTY-FIVE | 4/17/15 | BELL | Wire transfer, reference no. ending in 107E, to entity PFD from JPMC 0852 caused by defendant BELL | $760,501 |
| THIRTY-SIX | 4/23/15 | PIEHL | Check No. 442 to entity MMRT from BofA 0486 and signed by defendant PIEHL | $26,200 |
| THIRTY-SEVEN | 4/24/15 | BELL | Wire transfer, reference number ending in 114E, to entity PFD from JPMC 0852 caused by defendant BELL | $795,414 |

COUNTS THIRTY-EIGHT THROUGH FORTY-FOUR

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2(b)]

[DEFENDANTS PIEHL, EDWARDS AND SAMHAT]

32.    The Grand Jury realleges and incorporates paragraphs 1 through 22 of this Indictment here.

33.    On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, the defendants identified below knowingly and willfully solicited and received remuneration, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Professional Compounding for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| THIRTY-EIGHT | 3/4/15 | PIEHL | Check No. 6164 to entity WMG from BofA 9702 and signed by D.L. | $33,884 |
| THIRTY-NINE | 3/8/15 | EDWARDS | Check no. 1047 to entity MMRA from OB 1860 signed by defendant PIEHL | $16,800 |
| FORTY | 3/9/15 | EDWARDS | Check no. 1050 to entity the Foundation from OB 1860 and signed by defendant PIEHL | $6,000 |
| FORTY-ONE | 3/23/15 | SAMHAT | Check no. 1052 to entity MMRT from OB 1860 and signed by defendant PIEHL | $17,000 |
| FORTY-TWO | 4/5/15 | SAMHAT | Check no. 0488 to entity MMRT from BofA 0486 signed by defendant PIEHL | $5,100 |

34

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| FORTY-THREE | 4/19/15 | SAMHAT | Check no. 441 to entity MMRT from BofA 0486 signed by defendant PIEHL | $16,400 |
| FORTY-FOUR | 5/14/15 | PIEHL | Check no. 6556 to entity CTG from BofA account ending in 9702 signed by R.V. | $22,000 |

COUNTS FORTY-FIVE THROUGH FORTY-EIGHT

[18 U.S.C. §§ 1957, 2]

[DEFENDANT BELL]

34.   The Grand Jury realleges and incorporates paragraphs 1 through 22 of this Indictment here.

35.   On or about the following dates, in Orange County, within the Central of California and elsewhere, defendant BELL, knowing that the funds involved represented the proceeds of some form of unlawful activity, knowingly engaged in, aided and abetted, and willfully caused the following monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having, in fact, been derived from a specified unlawful activity, namely, mail fraud as alleged above, in violation of Title 18, United States Code, Section 1341:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| FORTY-FIVE | 2/23/15 | Transfer of approximately $92,855 from JP Morgan Chase Bank account ending in number 4060 in the names of defendant BELL and CB ("JPMC 4060") to Renick Cadillac by means of check no. 1214, payable to Renick Cadillac, dated 2/22/15 |
| FORTY-SIX | 5/21/15 | Transfer of approximately $500,000 from JPMC 0852 to Morgan Stanley account in the name of James N. Bell ending in account no. 1405 through a wire transfer, reference no. ending in 141E |
| FORTY-SEVEN | 6/24/15 | Transfer of approximately $2,600,000 from JPMC 0852 to Morgan Stanley account in the name of James N. Bell ending in account no. 1405, through a wire transfer, reference no. ending in 175E |
| FORTY-EIGHT | 9/16/15 | Transfer of approximately $3,927,014 from JPMC 4060 to Alliance Mutual Escrow, Inc., through a wire transfer, reference no. ending in 258E |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in any of Counts One through Twenty-One or Twenty-Eight through Forty-Four of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the

preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1          FORFEITURE ALLEGATION TWO

2      [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3      1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States of America

5 will seek forfeiture as part of any sentence, pursuant to Title 18,

6 United States Code, Section 981(a)(1)(C) and Title 28, United States

7 Code, Section 2461(c), in the event of any defendant's conviction of

8 the offenses set forth in any of Counts Twenty-Two through Twenty-

9 Seven of this Indictment.

10     2.    Any defendant so convicted shall forfeit to the United

11 States of America the following:

12          (a)    All right, title, and interest in any and all

13 property, real or personal, constituting, or derived from, any

14 proceeds traceable to any of the offenses; and

15          (b)    To the extent such property is not available for

16 forfeiture, a sum of money equal to the total value of the property

17 described in subparagraph (a).

18     3.    Pursuant to Title 21, United States Code, Section 853(p),

19 as incorporated by Title 28, United States Code, Section 2461(c), any

20 defendant so convicted shall forfeit substitute property, up to the

21 value of the property described in the preceding paragraph if, as the

22 result of any act or omission of said defendant, the property

23 described in the preceding paragraph or any portion thereof (a)

24 cannot be located upon the exercise of due diligence; (b) has been

25 transferred, sold to, or deposited with a third party; (c) has been

26 placed beyond the jurisdiction of the court; (d) has been

27 substantially diminished in value; or (e) has been commingled with

28 other property that cannot be divided without difficulty.

1

2

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

3    1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal
4  Procedure, notice is hereby given that the United States will seek
5  forfeiture as part of any sentence, pursuant to Title 18, United
6  States Code, Section 982(a)(1) and Title 28, United States Code,
7  Section 2461(c), in the event of any defendant's conviction of the
8  offenses set forth in any of Counts Forty-Five through Forty-Eight of
9  this Indictment.

10    2.  Any defendant so convicted shall forfeit to the United
11  States of America the following:

12        (a)  Any property, real or personal, involved in such
13  offense, and any property traceable to such property; and

14        (b)  To the extent such property is not available for
15  forfeiture, a sum of money equal to the total value of the property
16  described in subparagraph (a).

17    3.  Pursuant to Title 21, United States Code, Section 853(p), as
18  incorporated by Title 18, United States Code, Section 982(b)(1), and
19  Title 18, United States Code, Section 982(b)(2), any defendant so
20  convicted shall forfeit substitute property, if, by any act or
21  omission of said defendant, the property described in the preceding
22  paragraph, or any portion thereof: (a) cannot be located upon the
23  exercise of due diligence; (b) has been transferred, sold to, or
24  deposited with a third party; (c) has been placed beyond the

25

26

27

28

1  jurisdiction of the court; (d) has been substantially diminished in

2  value; or (e) has been commingled with other property that cannot be

3  divided without difficulty.  Substitution of assets shall not be

4  ordered, however, where the convicted defendant acted merely as an

5  intermediary who handled but did not retain the property in the

6  course of the money laundering offense unless the defendant, in

7  committing the offense or offenses giving rise to the forfeiture,

8  conducted three or more separate transactions involving a total of

9  $100,000.00 or more in any twelve-month period.

A TRUE BILL

_/S/_____
Foreperson

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

JOSEPH O. JOHNS
Assistant United States Attorney
Chief, Environmental and Community
Safety Crimes Section

ALEXANDER F. PORTER
Assistant United States Attorney
Acting Deputy Chief, Major Frauds
Section

PAUL G. STERN
Assistant United States Attorney
Senior Trial Attorney
Environmental and Community Safety
Crimes Section